IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
97 MAR 25 PM 12: 32
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| CATHERINE E. FOUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV96-H-350-S |
| | ) | |
| FEDERAL RESERVE BANK OF | ) | |
| ATLANTA, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

**MAR 2 5 1997**

### MEMORANDUM OF DECISION

Presently before the Court is the January 21, 1997 motion of
defendant for summary judgment. Pursuant to an Order entered
January 23, 1997, the motion was deemed submitted, without oral
argument, on February 20, 1997.

### I. Procedural History

Plaintiff commenced this action by filing a one-count
complaint in this Court on February 13, 1996. The complaint
alleged that defendant, her employer, had retaliated against her
for her earlier filing of an EEOC charge of discrimination under
the Americans with Disabilities Act (ADA). Plaintiff's claim was
brought pursuant to the anti-retaliation provision of the ADA, 29
C.F.R. § 1630.12(a).



## II. Standards for Evaluating a Summary Judgment Motion

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the trier of fact by means of summary judgment. Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1384 (11th Cir. 1996). However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . .are not rare in employment discrimination cases." Earley v. Champion International Corp., 907 F.2d 1077, 1080. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit encourages district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir. 1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting

2

framework established in  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff has the burden of establishing a prima facie case of discrimination.[1]  Second, after plaintiff has presented a prima facie case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated

---

[1] In order to present a prima facie case of discrimination, plaintiff must show:    (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802.  Based on O'Connor v. Consolidated Coin Caterers Corp., _____ U.S. ____, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

against the plaintiff. McDonnell Douglas, 411 U.S. at 804. In other words, "[a]fter a Title VII plaintiff makes out a prima facie case, and the defendant produces a legitimate nondiscriminatory explanation for its actions, the McDonnell-Burdine presumption drops from the case. At that point, the inquiry is whether the defendant intentionally discriminated against the plaintiff." Harris v. Shelby County Board of Education, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against her either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

4

explanation is unworthy or credence." Carter v. City of Miami,
870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's
proffer of credible, nondiscriminatory reasons for its actions is
sufficiently probative, then the plaintiff must come forward with
specific evidence demonstrating that the reasons given by
defendant were a pretext for discrimination." Brown, 939 F.2d at
950. "Conclusory allegations of discrimination, without more,
are not sufficient to raise an inference of pretext or
intentional discrimination where [a defendant] has offered
extensive evidence of legitimate, non-discriminatory reasons for
its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d
at 830).

### III. Relevant Undisputed Facts

Plaintiff began her employment with the Federal Reserve Bank
(FRB) on June 2, 1980 as an Assistant Check Collection Clerk
(grade 5) in the FRB's Birmingham office. (LaRue Aff.).
Plaintiff was hired to work the night shift, and was paid a 10%
premium in addition to her salary due to that fact. (Id.).
During her employment, she progressed upward in grade level,
eventually attaining the title of Lead Check Processor (grade 9).
(Id.).

However, plaintiff's night shift work began to cause her
problems. In August 1992, a physician who had treated plaintiff

5

wrote a letter to the FRB, stating that plaintiff had suffered a "significant depressive episode." (Foust Depo., Ex. 3). The physician, Dr. Grayson, further opined that "one of the significant contributors to this depressive episode seems to have been the sleep disruption associated with chronic night shift work." (Id.). Dr. Grayson further recommended that plaintiff be placed on the day shift, "to insure [sic] appropriate sleep rhythms." (Id.).

Upon receiving Dr. Grayson's letter, FRB officials investigated the possibility of transferring plaintiff to another position during the day shift. (Anderson Depo. at 47-49). However, at that time, there were no day shift positions available for plaintiff to fill. (Id.).[2] Plaintiff filed a charge of discrimination on October 5, 1992, claiming that the FRB had failed to reasonably accommodate her "disability" of depression. (Foust Depo., Ex. 4).

On February 9, 1993, a "Senior Processor" position during the day shift became open. (Anderson Depo., Ex. 7). The FRB agreed to transfer plaintiff to that position, and maintain her salary, despite the fact that the Senior Processor position was one grade lower than plaintiff's night shift job. (Id.).

---

[2]It is undisputed that the nature of the FRB's business -- serving as a clearinghouse for checks -- necessitates night shift work, and the bulk of the 1.8 million checks cleared through the FRB's Birmingham branch each day are handled by the night shift. (LaRue Aff.).

6

However, plaintiff did lose the 10% premium the FRB paid to night shift employees. (Id.). Plaintiff accepted this transfer, and withdrew her EEOC charge on February 16, 1993. (Foust Depo., Ex. 5).

Plaintiff's attendance record at the FRB was the source of ongoing discussions between plaintiff and her supervisors, both before and after her transfer to the day shift. Between May 1988 and May 1989, plaintiff missed work 13 days on three occasions, and her 1988-89 performance review stated that "Cathy's attendance record is marginal especially considering her position as a Senior Processor. Cathy is encouraged to make perfect attendance one of her primary goals this year." (LaRue Aff., Ex. A). Plaintiff's 1990-91 performance evaluation showed that she missed three days of work on two occasions that year, and the evaluation stated that "Cathy's attendance record should receive more attention." (Id., Ex. B). Another performance evaluation covering the period from May 1991 to February 1992 showed that plaintiff had missed four days of work on four occasions, and the evaluator wrote that "Cathy's attendance is below expectations, especially for her grade." (Id., Ex. C). Plaintiff was also formally counseled regarding her attendance on July 15, 1991 and April 22, 1992. (Foust Depo., Exs. 15 & 16). Plaintiff missed work 27 days on 9 occasions in the year preceding her transfer to the day shift. (LaRue Aff., Ex. F).

When the FRB transferred plaintiff to the day shift in

7

February 1993, one of the conditions of the transfer was that plaintiff would be expected to "improve her attendance." (Anderson Depo., Ex. 7).  In the ten months after her transfer, plaintiff took 12 sick days on six occasions.  (LaRue Aff.). Plaintiff was counseled twice more regarding her attendance, in March 1993 and July 1993.  (Foust Depo., Exs. 7 & 20).  Following these warnings, plaintiff missed two days in September 1993, and then called in sick the day after Thanksgiving and took sick leave on a day immediately following a vacation.  (LaRue Aff.).

After these absences, the FRB's management studied plaintiff's attendance records and determined that she had the worst attendance record of any employee in the FRB's Birmingham branch for the years 1992 and 1993.  (Id.).  Ralph LaRue recommended that plaintiff's employment be terminated on January 3, 1994, and the FRB's personnel committee agreed; plaintiff was terminated effective January 4, 1994.  (Id., Ex. E).[3]

## IV. Analysis

Defendant argues that plaintiff has insufficient evidence of retaliatory intent to present her case to the trier of fact. Although defendant argues that plaintiff cannot make out a prima

---

[3]LaRue's recommendation to the personnel committee states that, although plaintiff was transferred to the day shift because of problems associated with working at night, she subsequently took a second job that required night work.  (Id., Ex. E).

facie case under <u>McDonnell Douglas</u>, the Court will assume
(without deciding) that plaintiff has made out a <u>prima facie</u>
case.

Thus, the burden shifts to the defendant to articulate some
legitimate, non-discriminatory reason for terminating plaintiff
in January 1994.[4]  The FRB has clearly satisfied this burden of
production by citing plaintiff's attendance record as its
legitimate, nondiscriminatory reason for firing plaintiff.

This production by defendant leaves plaintiff in the
position of having to produce enough evidence of discriminatory
intent that a reasonable trier of fact could find in her favor.
Plaintiff cites several pieces of evidence in the record to
attempt to satisfy this burden.

First, plaintiff argues that the events surrounding
plaintiff's first EEOC charge in October 1992 show "bad faith" on
the part of the FRB.  Plaintiff points to the deposition of Andre
Anderson, who testified that the FRB did not attempt to determine
whether plaintiff's depression rendered her "disabled" under the
ADA.  (Anderson Depo. at 53-55).  Plaintiff suggests that this

---

[4]Plaintiff's complaint lists several alleged retaliatory
acts; plaintiff alleged that the FRB forced her to work
"excessive overtime," and the complaint contains several other
alleged instances of retaliation.  Defendant has introduced
evidence to rebut each of these alleged retaliatory acts, and
plaintiff has not mentioned any of them in her brief in
opposition to the summary judgment motion.  Thus, it appears that
plaintiff has jettisoned those claims and now alleges only one
retaliatory act -- the January 1994 termination.

answer could allow an inference that the FRB was deliberately ignoring plaintiff's rights under the ADA, and thus supports her claim of retaliation. The Court does not agree. The context of Anderson's deposition answer was that Dr. Grayson's letter gave the FRB insufficient information to determine whether she was "disabled" or not. (Id.). Furthermore, Anderson testified that the FRB did not make a determination about whether plaintiff was disabled, since it had decided to attempt to accommodate her anyway. (Id.). Put in its proper context, Anderson's testimony supports no inference of retaliatory intent.[5]

Plaintiff next argues that her pay was reduced when she was transferred, and that this pay reduction shows the FRB's retaliatory motive. However, it is undisputed that the only salary plaintiff lost when she was transferred was the 10% premium that the bank pays night shift employees. Furthermore, plaintiff admitted in her deposition that she understood that she would lose that premium if she changed to the day shift. (Foust Depo. at 143-44). The FRB's memorandum regarding plaintiff's transfer also recited that plaintiff understood that she would no longer receive the 10% premium. (Anderson Depo., Ex. 7). Plaintiff agreed to this arrangement and withdrew her first EEOC

---

[5]Plaintiff also asserts that the seven-month delay between Dr. Grayson's letter and her transfer to the day shift show "bad faith" on the FRB's part. However, plaintiff has not attempted to rebut defendant's evidence that there was no position available for plaintiff to fill on the day shift until February 1993.

10

charge a week later, and cannot now claim that her reduction in pay can support an inference of retaliation.

Plaintiff's third argument is that the FRB's true motives were revealed by its failure to follow all of the steps in its progressive discipline policy. The FRB's policy has five steps: verbal counseling, written counseling, an "unsatisfactory work notice," suspension, and termination. (LaRue Depo. at 87). It is undisputed that plaintiff did not receive an "unsatisfactory work notice" immediately preceding her termination, and was never suspended. The FRB's failure to follow all of the steps in its discipline policy shows retaliatory intent, according to plaintiff.

However, there is also evidence in the record that the FRB does not always follow all of the steps in its policy, if it appears that further steps are unlikely to result in improvement by the offending employee. (Anderson Depo. at 24-28). Regardless of this undisputed fact, the FRB's action in failing to follow its policy is not probative on the issue of retaliatory intent -- the trier of fact could infer from that evidence that the FRB was so displeased with plaintiff's attendance record that it decided to terminate her quickly.

Plaintiff next argues that her attendance record was improving prior to her termination. It is undisputed that plaintiff missed 25 days in 1992 and only 14 in 1993. Thus, plaintiff argues, the trier of fact could infer pretext from the

11

fact that her attendance problem was improving.  The Court cannot agree.  The undisputed evidence in the record was that plaintiff was reprimanded for missing three and four days in 1990-91 and 1991-92, respectively.  Viewed against this standard, plaintiff's 14 absences in 1993, after many counseling sessions and work performance appraisals citing poor attendance, were hardly the improvement the FRB was apparently looking for.  This is particularly true when viewed in light of the suspicious nature of plaintiff's absences in November and December 1993 -- after the Thanksgiving holiday and after a vacation.  In addition, the undisputed evidence in the record is that the FRB terminated other employees with attendance records similar to plaintiff's. (LaRue Aff.).  Given the evidence in the record, plaintiff's "improvement" in missing only 14 days in 1993 hardly suggests that the FRB's stated reason for her termination was pretextual.

Plaintiff also argues that her attendance record compared favorably to that of another FRB employee, Naomi Lewis, who missed 89 sick days in two years before being terminated.  (LaRue Aff.).  Plaintiff missed only 82 days in 14 years.  However, it is undisputed that the FRB terminated Ms. Lewis, and also terminated an employee who had missed 28 days in two years.[6] Given this evidence, the FRB's termination of Naomi Lewis cannot support any inference of retaliation or pretext.

---

[6]Plaintiff missed 39 days in the two years prior to her termination.

12

To conclude, the evidence in the record establishes that the FRB had problems with plaintiff's attendance both before and after she filed her EEOC charge and was transferred to the day shift.  The FRB terminated other employees with similar attendance records.  None of the pieces of evidence produced by plaintiff -- either separately or in the aggregate -- could support a reasonable inference of retaliation.  Defendant is entitled to judgment as a matter of law, and a separate Order and Judgment will be entered accordingly.

DONE this ___25th___ day of March, 1997.

SENIOR UNITED STATES DISTRICT JUDGE